UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STANLEY ETHRIDGE,            )
                            )
            Plaintiff,       )
                            )
    v.                       )        No.  4:11CV2100 AGF
                            )                    (TIA)
MICHAEL J. ASTRUE,           )
COMMISSIONER OF SOCIAL SECURITY,  )
                            )
            Defendant.       )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. § 405(g) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act.   The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

## I.  Procedural History

On December 22, 2008, Plaintiff protectively filed an application for a Period of Disability and Disability Insurance Benefits alleging disability beginning December 31, 2002.[1]  (Tr. 15, 135-41) Plaintiff alleged that he was unable to work due to emphysema, growth on left lung, right half of lung removed, arthritis, anxiety, depression, panic attacks, and tendonitis.  (Tr. 95)  The application was denied on March 12, 2009, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 92, 94-98, 102-03)  On March 3, 2010, Plaintiff testified at a hearing before the ALJ.  (Tr. 29-90)  In a decision dated April 29, 2010, the ALJ found that Plaintiff was not under a disability at any time from his alleged onset date of December 31, 2002 through March 31, 2009, the

_____

[1]  Plaintiff was last insured on September 30, 2009.  (Tr. 161)

date he was last insured. (Tr. 15-24) On June 21, 2011, the Appeals Council granted Plaintiff's request for review to consider Plaintiff's claim through September 30, 2009, the correct last insured date. (Tr. 131-34) On October 5, 2011, the Appeals Council issued a decision adopting the ALJ's findings or conclusions regarding whether Plaintiff was disabled through March 31, 2009. The Appeals Council also determined that the evidence of record showed no significant worsening of Plaintiff's condition from April 1, 2009 through September 30, 2009. Thus, the Appeals Council found that Plaintiff was not under a disability at any time from December 31, 2002 through September 30, 2009, the date last insured. As a result, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff appeared in person and was represented by counsel. Upon questioning by the ALJ, Plaintiff testified that he lived with his aunt and uncle in a one-story house with a basement. He was 51 years old, weighed 152 pounds, and measured 5 feet, 9 inches. He was single and had 4 adult children. Plaintiff's Tennessee driver's license was suspended due to no insurance. Plaintiff had no income but did receive food stamps and Medicaid. (Tr. 34-37)

In 1977, Plaintiff was kicked by a horse while working at Grant's Farm, resulting in a fracture to his right knee. Plaintiff received worker's compensation for the injury. Plaintiff took regular classes in school and almost completed the 9th grade. He did not have his GED, nor had he received vocational training. Plaintiff was able to read and write. He last worked March 1, 2008 for Work Force Incorporated, which was a temp agency. Plaintiff worked at a plastic factory making automobile seatbelt connectors. The heaviest he lifted was 30 pounds. Plaintiff worked there for about 2 months. Plaintiff was terminated from that job because he did not show up for work due to

health issues. Plaintiff further testified that, since March 2008, he had tried to find jobs by going to businesses and asking if they had any available jobs. He had a little experience in carpentry work. (Tr. 38-43)

In 2007, Plaintiff worked as a dishwasher at Ryan's Restaurant for about 2 months. He lifted pots of food for the garbage and pulled garbage cans out, which weighed 10 pounds or less. Also in 2007, he worked on the assembly line at the plastic factory and as a sorter, sorting different colors of paint. The heaviest he lifted was 25 pounds. Plaintiff additionally worked as a general laborer, performing carpentry work. He lifted a bundle of shingles, which weighted approximately 70 or 80 pounds. The last job Plaintiff performed was as an auto robotic machine operator. From 1980 to 2005, Plaintiff was a truck driver. He drove an 18-wheeler and was trying to get his commercial driver's license reinstated. The heaviest weight Plaintiff lifted as a trucker was 20 to 30 pounds at a time. Plaintiff also worked as a roofer and a tractor operator on a farm. Most of Plaintiff's jobs lasted no longer than a couple months. (Tr. 43-50)

Plaintiff testified that his disability onset date was December 31, 2002, when his lung condition began. He stated that he had surgery in 2003 or 2004, which included taking off the top right part of the lung. However, Plaintiff continued to work after his surgery, despite severe tendonitis. With regard to everyday activities, Plaintiff testified that he woke up around 6:00 or 6:30, did his hygiene, made coffee, read his devotion, and planned his day. After that, Plaintiff went to Preferred Family from 9:00 AM until 4:00 PM. He explained that Preferred Family was an outpatient program for alcoholics. Plaintiff stated he used to have a drinking problem and was staying clean and sober, trying to get his life back in order. He was attending a six month program that included group education, group therapy, and counseling five days a week. (Tr. 50-53)

Plaintiff also helped his aunt and uncle around the house by taking out the trash. He was able to cook, do laundry, wash dishes, make beds, vacuum, mop, sweep, and grocery shop. He was able to get along with others and made many friends. He was close to his daughter and active in the Galilee Baptist Church. He planned to get his GED and become a minister. Plaintiff watched movies on TV and read books. However, he had trouble staying focused while reading. He enjoyed conservation and "home life" magazines. (Tr. 53-58)

During the afternoons, Plaintiff cleaned up after group therapy, did some reading, and tried to keep busy. His aunt cooked dinner, but her health was declining. A case worker was trying to help Plaintiff find an apartment. In the evenings, Plaintiff sometimes took a slow walk. He went to church on Sundays. He was able to do a little gardening in the summer. Plaintiff enjoyed fishing and wood working. (Tr. 58-60)

Plaintiff further testified that he smoked two or three cigarettes a day. He last drank a 12-pack of beer on the past New Year's Eve. The only drugs he took were prescribed medications. However, he smoked a marijuana joint in June. Although the ALJ indicated that the file mentioned PCP, Plaintiff denied ever using PCP, Crack, or Heroin. He was previously dependent on speed. Plaintiff's current medications included Effexor for depression, Xanax for anxiety, Trazodone for sleep, and Soma for muscle spasms. He stated that all of these medications were helpful and produced no side effects. Plaintiff also used a Combivent inhaler for COPD. He was hospitalized in 2000 with a collapsed lung. Heat and asthma attacks aggravated his COPD. Plaintiff also testified that he had been diagnosed in 1993 with a mass under his lung, which doctors called bullous emphysema. He underwent several lung operations, including removing part of his lung. In addition to his other medications, Plaintiff took nitroglycerine for chest pain. Plaintiff stated that his chest hurt

two to three times a week. Plaintiff used the nitro only as needed. (Tr. 60-69)

Plaintiff was also diagnosed with tinnitus, which was ringing in his ears, and arthritis in both elbows and his right knee. In addition, he had degenerative bone disease in his back. He did not take any prescription pain medication but had an upcoming doctor's appointment. Plaintiff did take Ibuprofen for pain. Plaintiff also mentioned pain in his arm from an accident. With regard to his depression, Plaintiff stated that he cried frequently until the medication leveled his mood. The medications also helped with his anxiety. Plaintiff checked himself into a mental hospital for 2 weeks in 1995 because he was homicidal and suicidal. He previously saw a psychiatrist, Dr. Asher, who released him because the mediation was working. Although Plaintiff had thoughts of suicide, he never made any attempts on his life. He had seen evil faces on wallpaper. While one doctor mentioned antisocial features of Plaintiff's personality, he denied being antisocial and indicated that he merely had a problem with functioning and communicating. (Tr. 69-74)

With regard to his physical impairments, Plaintiff testified that he was uncomfortable sitting in chairs. He was better able to stand. Plaintiff believed he could walk a block or two and lift 20 to 25 pounds without pain. He had problems bending, stooping, crouching, kneeling, and crawling due to back problems. However, he was able to get down on his hands and knees to find something he dropped on the floor. Plaintiff could handle steps pretty well. Plaintiff also mentioned that he had some previous convictions. His son was in prison for murder. (Tr. 75-78)

Plaintiff's attorney also questioned Plaintiff, who stated that he last went fishing in 2007. He was able to chores around the house. He took about 5 to 10 minutes to clean a little mess. Although his concentration was good at the hearing, Plaintiff had anxiety attacks which threw him into a different state of mind. The Xanax helped, but he still experienced bad days, especially with his pain

and family issues.  He stated that he would be "a basket case" without the right doctors and the right medications.  He takes about 15 minutes to do relaxation exercises during an anxiety episode.  In addition, Plaintiff had trouble remembering what he read earlier in the day; however, his long term memory was intact.  Further, Plaintiff complained of headaches from dry sinuses that lasted for about two days and caused him to vomit and become cross-eyed.  He took Flonase for his sinuses, but fresh air worked best.  Plaintiff experienced these headaches about once a week.  (Tr. 79-83)

A vocational expert ("VE"), Mr. Stock, also testified at the hearing.  The VE noted Plaintiff's numerous past jobs in terms of titles, DOT numbers, skill levels, and exertional levels.  Plaintiff had worked as an assembly line worker, machine operator, dishwasher, construction laborer, sorter, and truck driver.  The ALJ then asked the VE to assume a person aged 51 with limited education and past relevant work previously outlined.  The person was capable of performing light work and could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently.  He could also sit and walk for a total of 8 hours in an 8-hour workday.  The individual could only occasionally stoop, crouch, kneel, crawl, and climb ladders, ropes, and scoffolds.  He could have no concentrated exposure to dust, fumes, and gases.  In response to the ALJ's question whether the person had transferrable skills, the VE answered that there were none.  In addition, the restrictions affected the performance of past relevant work in that he would be unable to perform the positions as ordinarily performed in the national economy.  However, he could work as an assembly line worker, machine operator, and dishwasher as Plaintiff performed those jobs.  In addition, the individual could work as a housekeeper and packer/mailer.  These positions were merely representative of jobs the hypothetical person could perform.  (Tr. 83-88)

Plaintiff's attorney then added moderate psychiatric limitations.  With these limitations, which

caused the person to miss three to four days a month, such person would be unemployable. In addition, the other moderate limitations would require too many accommodations for employment. (Tr. 88-89)

In a Disability Report – Adult, Plaintiff reported that he suffered from "emphysema/growth on left lung/rt half of lung removed/arthritis/anxiety/depression/panic attacks/tendonitis." He stated that he was in constant excrutiating pain, experienced anxiety and panic attacks, coughed up blood, and had shortness of breath. He stopped working on March 1, 2008 because he was fired. (Tr. 179-88)

Plaintiff also completed a Function Report – Adult on February 3, 2009. He reported that during the day, he took medication and tried to deal with his depression, anxiety, and panic attacks. He was preparing for the prison ministry and taking a seminar in home study. He needed reminders to take care of his personal needs and take medication. He was able to prepare meals once a day, as well as wash clothes, sweep, mop, and wash dishes. In addition, he went out once a day. Plaintiff was able to shop for groceries once a month, which took him several hours. He attended church fellowship three time a week. Plaintiff reported that his conditions affected his ability to lift, bend, stand, reach, sit, kneel, hear, stair climb, remember, concentrate, and understand. He could walk a couple hundred feet before needing to rest for 10 minutes. (Tr. 204-11)

### III. Medical Evidence

On October 20, 2008, Robin Musselman, a registered nurse at Family Care Health Center, saw Plaintiff for complaints of depression and chest pain, as well as to request a referral for medication refills. Nurse Musselman noted that Plaintiff was in no apparent distress but appeared anxious. She assessed depression and anxiety; history of bolus emphysema; right upper quadrant

abdominal pain; and allergic rhinitis. She prescribed medication and advised Plaintiff to return in 2 weeks. (Tr. 333-35)

Plaintiff returned on November 6, 2008 and stated that the Clonazepam did not help, but the Effexor was helpful. He continued to complain of chest wall pain and back pain. Nurse Mussleman assessed bolus emphysema; depression and anxiety; and chest wall pain. She prescribed naproxen, doubled Plaintiff's Effexor dosage, and planned to refer him to psychiatrist Jaron Asher, M.D. when Plaintiff returned in one month. (Tr. 331-32)

Rocky Sieben, LCSW, performed a 40 minute psychotherapy assessment of Plaintiff on November 24, 2008. Plaintiff stated that he wanted a prescription for Xanax. Plaintiff reported occasional anxiety attacks not related to a particular situation. Mr. Sieben noted that Plaintiff had frustration, anxiety, guilt, poor appetite, and decreased energy and concentration. Mental status exam revealed depressed mood and affect. Plaintiff's insight and judgment were fair. Mr. Sieben diagnosed major depression and anxiety NOS, with a global assessment functioning ("GAF") score of 56.[2] (Tr. 328-30)

On December 3, 2008, Plaintiff followed up with Nurse Musselman. He again reported that the Clonazepam did not help and the Effexor helped a little. Nurse Mussleman referred Plaintiff to Dr. Asher for psychiatric services. (Tr. 326-27) Dr. Jaron Asher evaluated Plaintiff on December 8, 2008. Plaintiff complained about his "nerves." He reported abusing diet pills in the past, when he was a truck driver and needed to stay awake. His anxiety began two or three years ago. Dr. Asher noted that Plaintiff was anxious; had decreased interests and energy; and was frustrated,

---

[2]  A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

overwhelmed, and tense. Additional stressors included money difficulties. Mental status exam revealed an anxious mood and affect. Further, Plaintiff could remeber only two of three objects after three minutes. Dr. Asher diagnosed depression, anxiety, and a history of alcohol and amphetamine abuse, with a GAF of 55. (Tr. 322-24)

When Plaintiff returned to Mr. Sieben and Dr. Asher on December 17, 2008, Plaintiff reported feeling very overwhelmed. Mr. Sieben noted that Plaintiff was tearful and hopeless but not suicidal. Mr. Sieben encouraged Plaintiff to focus on applying for disability and obtaining his GED. Plaintiff told Dr. Asher that he was less anxious with Xanax but had trouble sleeping the previous night due to anxiety. Dr. Asher noted that Plaintiff was worried and assessed a GAF score of 55. (Tr. 320-21)

On December 18, 2008, Plaintiff returned to the Family Health Care Center and complained that he was overwhelmed with pain and anxiety. He stated he had not slept in 48 hours and was ready to give up. (Tr. 319) On that same date, Plaintiff presented to Metropolitan Psychiatric Center complaining of lung pain, decreased sleep, and decreased energy. He stated that his mood was good. Plaintiff was diagnosed with depression, NOS, and PCP abuse, but the staff rated the severity of his mental illness as normal. Plaintiff was to follow up with Dr. Asher, take his medications as prescribed, and refrain from using drugs or alcohol. (Tr. 311-15)

When Plaintiff saw Dr. Asher on January 14, 2009, Plaintiff reported feeling better but still having problems sleeping. Dr. Asher noted that Plaintiff was more at ease but diagnosed depression, anxiety, history of alcohol and amphetamine abuse, and a GAF of 57. Dr. Asher recommended that Plaintiff continue psychotherapy with Rocky Sieben, LCSW, and transfer psychiatric care to Nurse Musselman because his medications were unchanged. (Tr. 317-18)

Plaintiff returned to Nurse Musselman on January 21, 2009, who noted that Plaintiff had

rambling speech but good eye contact. Nurse Musselman assessed anxiety and depression and noted chest pain, which she believed resulted from anxiety. Plaintiff also met with Mr. Sieben regarding concerns about Plaintiff's probation officer. (Tr. 402-404) During a therapy session on February 6, 2009, Mr. Sieben noted that Plaintiff's mood was nervous. Mr. Sieben assessed depression and generalized anxiety and advised Plaintiff of exercises to control anxiety. (Tr. 401) On February 27, 2009, Plaintiff sought pulmonary treatment at Connect Care. (Tr. 348-51)

Plaintiff met with Dr. Asher and Mr. Sieben on March 25, 2009. Dr. Asher noted that Plaintiff's affect was demoralized and that his thoughts were focused on his poor status. Dr. Asher assessed depression, anxiety, a history of alcohol and amphetamine abuse, and a GAF of 52. Dr. Asher planned to continue to manage Plaintiff's psychiatric condition. During Plaintiff's session with Mr. Sieben, Plaintiff's mood was depressed, and his thoughts and body language reflected physical pain. Mr. Sieben assessed a GAF score of 57 and provided materials for Plaintiff to practice meditation at home. (Tr. 397-98)

When Plaintiff returned to Dr. Asher on April 22, 2009, Plaintiff had multiple somatic complaints. Mr. Sieben could no longer see Plaintiff because he missed three appointments. Plaintiff reported problems sleeping despite taking Trazadone. Dr. Asher noted that Plaintiff's affect was down and assessed a GAF score of 52. He increased Plaintiff's Trazadone dosage and provided a list of outside therapy resources. (Tr. 395)

On May 5, 2009, Mr. Sieben completed a Mental Medical Source Statement, indicating that Plaintiff was moderately limited in his abilities to: behave in an emotionally stable manner; relate in social situations; interact with the general public; accept instruction and respond to criticism; respond to changes in the work setting; and work in coordination with others. Further, Mr. Sieben opined

that Plaintiff was markedly limited in his abilities to: cope with normal stress; maintain attention at work tasks for up to 2 hours; and perform at a consistent pace. In addition, Plaintiff would have unpredictable interruptions several times each work day, and each interruption would last 15 to 30 minutes. Mr. Sieben also opined that Plaintiff would be tardy more than 8 times a month and absent more than 5 times a month. These limitations had lasted or would last for 12 consecutive months due to major depression and generalized anxiety. (Tr. 371-74)

On May 20, 2009, Dr. Asher opined that Plaintiff was unable to work. (Tr. 392) Dr. Asher also completed a Mental Medical Source Statement on that date, opining that Plaintiff was moderately limited in his abilities to: function independently; relate in social situations; accept instructions and respond to criticism; and make simple work-related decisions. Further, Plaintiff was markedly limited in his abilities to: cope with normal work stress; behave in an emotionally stable manner; maintain socially acceptable behavior; understand and remember simple instructions; maintain attention to work tasks for up to 2 hours; perform at a consistent pace; sustain an ordinary routine without special supervision; respond to changes in a work setting; and work in coordination with others. Dr. Asher also believed that Plaintiff would often have unpredictable interruptions during a normal work day or week and that his medically determinable impairments would cause him to be absent from work 3 or 4 times a month. He opined that Plaintiff's limitations lasted or would last 12 consecutive months and that the impairments were cyclical in nature. (Tr. 378-81)

When Plaintiff returned to Nurse Musselman on June 15, 2009, she noted that Plaintiff was in no apparent distress but was anxious with pressured speech. She diagnosed anxiety and depression and recommended follow up visits with Dr. Asher and Mr. Sieben. (Tr. 388) Plaintiff reported feeling better during a visit with Mr. Sieben on June 22, 2009. Mr. Sieben assessed a GAF score of

53. (Tr. 390)

On July 20, 2009, Dr. Asher noted that Plaintiff's affect was mildly anxious and that his thoughts were focused on his anxiety. Diagnoses again included depression, anxiety, and a GAF of 53. Dr. Asher continued Plaintiff's prescriptions and added Seroquel for anxiety. Plaintiff also met with Mr. Sieben, who noted Plaintiff's mood was mildly anxious. Mr. Sieben discussed anxiety reduction strategies and diagnosed major depressive disorder, general anxiety, and a GAF of 53. (Tr. 383-84)

In August 2009, Dr. Asher and Mr. Sieben completed medical source statements regarding Plaintiff's history of alcohol and amphetamine use. Both sources indicated that they had not seen any indications of current substance abuse. (Tr. 413-15)

Plaintiff returned to Dr. Asher and Mr. Sieben on September 14, 2009. Plaintiff informed Dr. Asher that the Seroquel made him too sleepy and that he stopped taking it. Dr. Asher noted that Plaintiff's affect was mildly anxious and assessed depression, anxiety, history of alcohol and amphetamine abuse, and a GAF of 53. During a therapy appointment with Mr. Sieben, Plaintiff's mood was sad and anxious, and his speech was very soft. He was distressed over the situation with his youngest son. (Tr. 420-21)

On November 9, 2009, Plaintiff reported to Dr. Asher that the medications were helping. Dr. Asher noted that Plaintiff's affect was generally euthymic with some anxiety. In addition, due to Dr. Asher's restricted hours and the fact that the medications stayed the same, Dr. Asher transferred psychiatric care to Nurse Musselman. (Tr. 418)

Lenora V. Brown, Ph.D., provided a consultative psychological examination on January 23, 2010. Dr. Brown reported that Plaintiff's presentation lacked credibility, and at times he appeared

to exaggerate his symptoms. Plaintiff stated that he last drank alcohol in December 2009 but that he drank one half case of beer a day for 20 years. Dr. Brown noted that Plaintiff's eye contact was poor and that he appeared to be fabricating his story. He had no impairment in activities of daily living or ability to perform personal grooming. Dr. Brown diagnosed depressive disorder NOS; anxiety disorder; alcohol dependence; and personality disorder NOS with antisocial features. Plaintiff's GAF score was 70.[3] Dr. Brown opined that Plaintiff's abilities in the social and occupational domains were mildly impaired but that any limitations were likely due to alcohol dependence. In addition, she believed Plaintiff would need assistance in managing funds due to his history of alcohol dependence and his "limited insight and judgment." (Tr. 425-33)

On March 12, 2009, Kyle DeVore, Ph.D., completed a Psychiatric Review Technique Form. Dr. DeVore concluded that Plaintiff's psychiatric status was non-severe. (Tr. 356-66)

On May 21, 2009, Plaintiff presented to the emergency department at Barnes-Jewish Hospital after he was assaulted. He reported that his Xanax had been stolen and that he needed a refill. He did not require any additional services from the social worker. (Tr. 480-82) Plaintiff again presented to the ER on December 18, 2009, claiming that he was assaulted. Plaintiff was calm, cooperative, and displayed clear speech. (Tr. 456) On January 2, 2010, Plaintiff entered St. Louis University Hospital complaining of being sore all over after multiple falls. The diagnosis was facial contusion; fall; alcohol abuse; and homelessness. He reported smoking ½ pack of cigarettes a day and drinking a couple of beers daily. Plaintiff was in no apparent distress and smelled of alcohol. He was

---

[3]  A GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

discharged to home in stable condition.  (Tr. 435-42)

## IV.  The ALJ's Determination

In a decision dated April 29, 2010, the ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on March 31, 2009.  He did not engage in substantial gainful activity during the period from his alleged onset date of December 31, 2002 through the date last insured.  The ALJ further found that Plaintiff's severe impairment was bullous emphysema.  Non-severe impairments included substance abuse in remission, anxiety, and depression.  Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled on of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17-18)

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in the regulations except that he could only occasionally crouch, kneel, or crawl.  In addition, he could have no concentrated exposure to pulmonary irritants.  The ALJ then assessed the medical evidence pertaining to Plaintiff's bullous emphysema and alleged anxiety and depression.  The ALJ determined that Plaintiff was capable fo performing his past relevant work as a machine operator and dishwasher, as he performed those jobs.  He could not return to his other past relevant work.  Thus, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from December 31, 2002 through March 31, 2009.  (Tr. 19-23)

The Appeals Council later adopted the ALJ's findings and conclusions regarding whether Plaintiff was disabled through March 31, 2009 and determined that the record did not show a significant worsening between April 1, 2009 and the date last insured, September 30, 2009.  Thus, the Appeals Council determined that Plaintiff was not under a disability at any time from December 31, 2002 through September 30, 2009.  (Tr. 4-5)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process.  See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'"  Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence,

the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[4] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence

---

[4]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two arguments in his Brief in Support of the Complaint. First, he argues that the ALJ's determination that Plaintiff did not have a severe psychiatric impairment was not supported by substantial evidence. Second, Plaintiff asserts that the ALJ erred in giving significant weight to the opinions of non-treating, non-examining physician Kyle Devore, Ph. D., and to consultative examiner Lenora V. Brown, Ph.D. Defendant, on the other hand, contends that the ALJ properly determined that Plaintiff did not have a severe mental impairment. Further, Defendant asserts that the ALJ properly determined Plaintiff's RFC and found he could perform his past work and other work. The undersigned finds that substantial evidence supports the ALJ's determination and the decision of the Commissioner denying benefits should be affirmed.

### A. The ALJ's Determination of a Non-severe Mental Impairment

Plaintiff first contends that the ALJ erred in finding that Plaintiff did not have a severe mental impairment. However, as Defendant correctly asserts, substantial evidence supports the ALJ's determination. The ALJ noted that Plaintiff had mild degrees of restriction with regard to his activities of daily living, interacting with others, and concentration, persistence, or pace. Plaintiff had no episodes of decompensation of an extended duration. Further, the presence of mild depression and anxiety did not support a finding of severe impairments. Plaintiff was sociable and attended church three times a week. He was studying to become a minister, and he testified that he had good concentration and that his condition improved with medication. He had no side effects. "An impairment which can be controlled by treatment or medication is not considered disabling." Estes

v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); see also Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009) ("There is substantial evidence that, when taken as directed, the medication [plaintiff] was prescribed was successful in controlling his mental illness.").

While mental health treatment records show consistent complaints of depression and anxiety, his GAF scores demonstrated only moderate degrees of limitation. Further, the episodes of anxiety and depression were related to life stressors, including lack of income and his son's murder conviction and incarceration. As such, substantial evidence in the record demonstrates that Plaintiff's depression and anxiety were situational and did not result in significant functional restrictions. Dunahoo v. Apfel, 241 F.3d 1033, 1039-1040 (8th Cir. 2001); Shipley v. Astrue, No. 2:09CV36MLM, 2010 WL 1687077, at *12 (E.D. Mo. April 26, 2010).

Further, the fact that a plaintiff was diagnosed with depression and general anxiety does not mean the impairments are severe. A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include physical functions; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervisors, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). Here, Plaintiff is able to perform household chores, socialize, grocery shop, and pursue his GED and training in the ministry, which demonstrates that Plaintiff's medically determinable mental impairment causes no more than a mild limitation in activities of daily living; social functioning; and concentration, persistence, and pace. See Buckner v. Astrue, 646 F.3d 549, 555 (8th Cir. 2011) (finding plaintiff's depression was not severe where, inter alia, plaintiff engaged in a daily activities that were inconsistent with his allegations). In addition, most recent medical

records show that he did not complain of severe mental impairments to medical professionals.

Plaintiff also relies heavily on the GAF scores from Dr. Asher and Mr. Sieben, which consistently indicated moderate, not mild, symptoms. However, "plaintiff's continued low GAF scores are not conclusive evidence that he has an underlying mental impairment that would render him disabled." Olsen v. Soc. Sec. Admin., No. 4:08-CV-1442 (CEJ), 2010 WL 1038542, at *11 (E.D. Mo. March 17, 2010). In short, substantial evidence supports the ALJ's finding that Plaintiff's mental impairments were non-severe and thus not disabling.

## B.  Weight Given to Non-treating Physicians

Plaintiff also argues that the ALJ erred in giving significant weight to Dr. Brown and Dr. DeVore. The undersigned disagrees. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

In this case, the ALJ properly found that the opinions offered by Dr. Asher in his medical source statements were inconsistent with the medical evidence, inconsistent with Plaintiff's testimony, and absent function-by-function analysis of Plaintiff's capacities. Therefore, the ALJ gave the

opinions little weight.  (Tr. 22)  The record shows that Dr. Asher performed very brief mental status examinations and primarily monitored Plaintiff's medications.  Dr. Asher mentioned no work restrictions or activity limitations and noted improvement or mild symptoms on most occasions.  See Choate v. Barnhart, 457 F.3d 865, 870-71 (8th Cir. 2006) (finding that ALJ properly discredited physician's Medical Source Statement where treatment notes never mentioned restrictions or limitations to the plaintiff's activities).

On the other hand, the assessment by Dr. Brown more thoroughly examined Plaintiff's mental status and discussed Plaintiff's ability to function.  (Tr. 425-33)  "An ALJ may accord greater weight to a consulting physician only where the one-time medical assessment is supported by better or more thorough evidence or where a treating physician renders inconsistent opinions."  Turner v. Astrue, No. 4:08-CV-107 CAS, 2009 WL 512785, at *11 (E.D. Mo. Feb. 27, 2009) (citation omitted). Here, Dr. Brown's opinions are consistent with Plaintiff's testimony and the other evidence in the record, indicating improvement with medication and the ability to function in activities and daily and social living.  Indeed, the Metropolitan Psychiatric Center rated the severity of his mental illness as "normal" when Plaintiff sought admission.  (Tr. 311-15)

Plaintiff also references the psychiatric treatment records from the Family Health Care Center in support of Plaintiff's allegations of severe depression and anxiety.  The record shows that Plaintiff met with Rocky Sieben, LCSW, for several therapy sessions.  However, Mr. Sieben is not an acceptable medical source entitled to significant weight.  The ALJ may consider evidence regarding the severity of a plaintiff's impairment and how it affects his or her ability to work include medical sources such as nurse-practitioners, physicians' assistants, chiropractors, and therapists.  20 C.F.R. § 404.1513(d)(1).  While the ALJ could, and indeed did, consider Mr. Sieben's opinions under the

regulations, the ALJ was not obligated to give the opinions controlling weight. (Tr.22) <u>See</u> Social Security Ruling, SSR 06-03p, 71 Fed. Reg. 45593-03 (Aug. 9, 2006) (distinguishing between "acceptable" and "not acceptable" medical sources and stating that only "acceptable medical sources" can provide evidence to establish the existence of a medically determinable impairment, give medical opinions, and can be considered treating sources whose opinions may be entitled to controlling weight). The ALJ correctly determined that Mr. Sieben's opinions in the medical source statement were inconsistent with the notes and observations of providers at the Family Health Care Center and with Plaintiff's testimony.

The ALJ afforded proper weight to the medical opinions in the record. Thus, the undersigned finds that substantial evidence based on the record as a whole supports the ALJ's determination that Plaintiff's mental impairments were not severe and that Plaintiff was not under a disability at any time through the date last insured.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time

for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this _24th_ day of January, 2013.